Welcome to the 2nd Division of the 1st District Appellate Court. Would the counsel who are going to argue this morning please approach the bench, identify yourselves for the record so that the audio recording can identify you, and indicate to the court how much time you would like for your respective arguments. Harina Megani-Wakely Good morning, Your Honors. I'm Harina Megani-Wakely, Assistant State's Attorney for Cook County, and I represent the people, and I would be asking for the usual 15 minutes for my argument. Jed Stone Good morning, Your Honor. My name is Jed Stone on behalf of your appellant, Wayne Weinke. If I could have 10 minutes for my argument and reserve 5 for rebuttal. Well, this is one of the most agreeable divisions of the court, so we'd be happy to give you 20 and 20, cut it up any way you want, because it's an interesting case and there's some detail you may want to get into. Very good. Thank you, Judge. Mr. Stone, are you ready to proceed? Jed Stone May please the court. My name is Jed Stone, and I represent Wayne Weinke, your appellant. Prosecutors have a duty to be honest with the court. All lawyers have a duty of candor to the court, but prosecutors are in a special role as public prosecutors, not simply to win, but to win. In this case, prosecutors told a Cook County circuit judge that they had reviewed medical records, that they had talked to Ms. Weinke's physicians, that there was a closed head injury, that there was a fractured spine, that there were multiple abdominal abrasions. That Ms. Weinke was in an unstable, critical condition and that she was declining. Based upon those assertions, they asked for and received the extraordinary remedy of a videotaped deposition. But the state says that they correctly represented the proffer, was accurate, based on medical evidence available to the prosecutor at the time. They have no medical records. They didn't review the medical records. They didn't talk to the physicians. What they knew was that she was 77 years old. That was true. That she had metastasized cancer. That was also true. But it was not true that she was declining. It was not true that she was in critical condition. It was not true that she was unstable. And perhaps even more importantly, their application for an evidence deposition was unverified. Where does it say it must be verified? The Supreme Court rule for applications for... 217? Yes. But why is 217 relevant? Because... Doesn't 217 conflict with 414? 414 talks specifically about criminal. I think to... but to... the Supreme Court has said that the depositions will be taken as per the civil rules. Taken. Right. Taken. Taken. We're talking about notice. Well, notice is a precondition to taking a deposition, isn't it? Precondition is not the taking. Their application was unverified. There's a reason that it should have been verified. And the reason is not only do lawyers have an obligation for candor, but the verification is a method of verifying the truthfulness of an application. Their statement... As an alternative as a verification too? Sure. So you're saying only a verification would have done... You're saying a verification would have satisfied the rule. They didn't speak to the doctors. They didn't review medical records, and they've admitted that. So when they told the judge, we've spoken to doctors and reviewed medical records, that she suffered a head injury, that she had a closed head injury, that she had a fractured spine, that she had a collapsed lung, that her condition was unstable, that her condition was rapidly deteriorating, that she was in danger of imminent death, but all of that was false. Mr. Stone, would it make a difference if the petition were unverified, in a different case, hypothetically? If the petition's unverified, but all the representations made by the movement are accurate, would it make a difference then? It would take some steam out of your argument. It would take some steam out of the argument. I don't know that it would change the... I still think that we need a verified petition to... to make an informed decision that the purpose of allowing for the deposition in a criminal case could be satisfied without verification. That the verification should really come from the attorney making the representation. I don't disagree with that at all, Judge. What I emphasize is that in this case, that's not what we had. We had serious misrepresentations that are admitted to have been misrepresentations by the prosecution. They say otherwise, though. In the brief, they say they never admitted it. They make a flat-out statement. I think it's clear that when they told the judge, we've spoken to her doctors and we've reviewed medical records, at the time they applied for the videotape deposition, that they now say, well, we didn't really speak to the doctors and we didn't really review medical records. We spoke to the daughter of the victim and some of the police officers. Let me ask you a question. Rule 414A provides that the court may permit an evidence deposition upon motion and notice to both parties. They filed a motion and gave notice. Is there anything that they didn't do? Yes, they didn't properly represent the condition of the deponent. All right, stop right there. You're saying the motion itself was legally insufficient? I'm saying the motion itself was legally insufficient both as to its timing. This was a forthwith deposition. It's unlikely this court would ever permit a forthwith deposition in a civil case where money was at issue. Let me ask you this question. Is it your position that the court had insufficient notice and the notice itself to make the determination as to whether or not it was necessary for the preservation of testimony to grant them their motion to take the deposition? Yes, because there was no opportunity to meaningfully test the prosecutor's misrepresentations that there was a closed head injury, that there were internal injuries, that there was a fractured spine. This court can't countenance that behavior by a lawyer. But you're saying they provided insufficient information concerning the condition of the witness for the court to make an informed decision? Both insufficient and factually inaccurate, yes. Would you answer me any different hypothetically if the proffer was accurate? Make a difference? Hypothetically? Then we would be talking about whether or not the court abused discretion in granting the deposition and whether or not two hours to prepare for a deposition was an adequate opportunity to cross-examine. We would be talking about different issues. But that's not what we have in this case. I understand the position. So if the proffer by a state representative turns out to be false, which is your position, what should the court have done, the second court, Judge Lacey? Is there something that he did not do that he should have done? Yes. He should have had a hearing, which he did not have, on the conditions of the deponent and redetermined whether or not the taking of the deposition was necessary. If the taking of the deposition was not necessary, then it should not have been admitted to trial. And he didn't do that. In fact, he refused to do that, even though requested by the defense to hold a hearing on it. I think his words were that he wasn't going to sit as a, pardon the term, appellate court for the other judge. Well, that sounds almost like you're intimating a Franks-type hearing for this type of situation. Where in Franks, as you well know and I'm sure the state knows, if it can be established that the affiant for a search warrant may have been untruthful and lied to the magistrate who issued the search warrant, the defendant can make a showing to allow for going behind what transpired to bring us to where we were. And what's the underlying reason for a Franks analysis? We demand with prosecutors, when people's rights are at stake, integrity, truthfulness, honesty, because anything else undermines the reliability of the process. This is, after all, a first-degree murder prosecution. This is, after all, an action by prosecutors that I believe and urge you to understand that their conduct seriously undermines the integrity of the judicial process. They lied to a judge in meaningful ways. Let's go to the statement by Judge Lacy that he's not to sit on judgment of the appellate court on Judge Hanlon's ruling. Isn't that exactly, not appellate court, but isn't that exactly the reason for the hearing was to review that particular ruling? Wasn't that the purpose? I mean, how could he say that? I mean, if he says that, it's a fait accompli. Is there any other reason to bring an issue before a judge other than to ask him to review what had happened before? I mean, it was the only purpose of that hearing. That was right before him. Right. My experience of nearly 40 years at the bar defending criminal cases is that judges often say we don't want to sit as appellate judges when really they're abnegating their responsibility to review what has happened and to protect the rights of the accused. Some may argue, though, that Judge Lacy's role at that point was to decide whether the statement was admissible considering whether the defendant had an opportunity to cross-examine and to explore the potential testimony of the unavailable witness, which is a lot different. I mean, if you're analogizing these to bail hearings or grand jury testimony or anything else, whether the unavailable witness's testimony should be admitted, isn't the inquiry at that point about, well, is it fair to admit it at this point because the defendant is not able to cross-examine that transcript or video? Did he have that opportunity at the earlier time, at the time the statement was gathered? I think you must agree that the question of what is fair and appropriate is a fact-specific question. In some instances, the trial judge's inquiry will be limited, focused with laser precision to a single issue, was there an adequate opportunity to cross-examine. But in other cases, such as this one, it is not a laser but more a beam that the judge would have to consider. Did you cite any cases on that question, that issue? No. Okay. In your vast experience, are you familiar with any? There's no case that comes to mind that answers that question. Okay, I didn't want to, you know. No, no, no. You offered me 20 minutes and said that there would be interesting questions. You were true to your word. The question then is, I think, given these misrepresentations, which I think there's no question but that there were misrepresentations, was the defendant prejudiced in any way? And the answer is clear on the record. He was prejudiced. He was propelled into a deposition of the main prosecution witness in the case and only had two hours to prepare. He was propelled into a deposition where he didn't have the opportunity to review the medical records. He didn't have the opportunity to come to understand Mrs. Winkie's dementia and the onset of that dementia and the evidence later presented at trial, but never had the opportunity to confront Mrs. Winkie with the evidence of her dementia, never had the opportunity to cross-examine Mrs. Winkie about things like her statement that Wang turned the light off when he left, but in fact when the security people arrived, the light was on. Never had the opportunity to cross-examine Mrs. Winkie on her statement that she was in pajamas when she was awakened by Wang early pre-dawn that morning, but when she was found, she was found not in pajamas but in a house coat with a brassiere and socks on. You're saying the attorney did not know she was found with a house coat and socks on? Didn't know any of that information and of course he needed that. So no discovery had been exchanged? Some police reports had been exchanged at this point, but we're two hours into this notice. Photos? Pardon me? Photos? There were photographs. So he had some information about it. Getting information and being able to understand it and make use of it are different things. The opportunity to cross-examine implies, in fact requires, the opportunity to investigate, to prepare, to understand. Otherwise it's a hollow exercise. It is a thoughtful process to figure out how to ask questions of the complaining witness in a criminal case. You know this to be true. And two hours' time without full discovery on notice that is riddled with facts that are inaccurate is unconscionable. This court ought not countenance that kind of behavior. Is that unconstitutional? It is unconstitutional. It deprives Mr. Wienke of his right of confrontation and cross-examination. Cross-examination must be meaningful for it to be constitutional. The opportunity is not simply you have the chance to ask questions, to flap wings. The opportunity is an opportunity to understand the facts of the case and to confront the witness with those facts. No opportunity was present for Mr. Wienke's lawyers in this case. As if what I described to you this morning in terms of the video deposition was not bad enough, the cross-examination of Mr. Wienke and the rebuttal argument in this case must be condemned by this court. Asking a witness once or twice was this or that witness a liar is wrong, shouldn't be tolerated. Prosecutors shouldn't do it, probably doesn't require a reversal. But to ask ten times over objection, having those objections overruled by the trial court. Asking about three witnesses and several police officers is an abuse of prosecutorial cross-examination power. Was the issue in the post-trial motion? The issue was not completely presented in the post-trial motion. When you say completely, how do you say that it was partially? I don't know that it is in the post-trial motion. I think it's plain error. While we're on the subject of forfeiture or waiver, I would like to point out that at paragraph 3 of the post-trial motion found at the common law record 490 and paragraph 13, 14, and 15 of the post-trial motion common law 492, the issue of presenting a videotaped deposition and the issue of notice of the videotaped deposition is preserved in the record. On this topic, is the fact that this was a bench trial, does that mitigate this in any fashion? Presumably a trial court ignores inadmissible evidence and is not swayed by the passions and propriety of the parties. I think we said that, we talked about that in our brief. It certainly mitigates, as you would say, but it doesn't take away the full force of the argument because we had a trial judge who assisted the prosecutor in this wrong-minded cross-examination of Mr. Wynke by instructing Mr. Wynke by denying, by overruling objections, and then by telling Mr. Wynke over and over again, multiple times, just answer the question yes or no. Was Mrs. Wynke a liar? Just answer the question yes or no. That says to me that the judge did not understand how wrong these questions were and when the judge said in his ruling on the case that the video deposition of Mrs. Wynke was the single most important piece of evidence in a prosecution case, my word, not the judge's, I think that he is saying I considered evidence that I should not have considered in making my ruling. So I believe that while we have a hill to climb because this was a bench trial, the record supports our having climbed that hill and you shall grant relief even though it was a bench matter. Thank you. All right.  Ms. Wynke. Good morning again, Your Honors. I am Assistant State's Attorney Harina Megani-Wakely representing the people of the State of Illinois. The trial court did not abuse its discretion in allowing the people to take the deposition in this case. There was a substantial possibility of unavailability of Gloria. She was 77 years old with a broken pelvis, sick with cancer, and about to go into major surgery. As Judge Lacy properly noted, surgery is risky for the healthiest of all people, but in Gloria's condition it posed a substantial risk of unavailability. There were absolutely... Did any doctor say that? I'm sorry? Was there any doctor who said that? Any expert testify or provide any evidence? Was there any evidence given? Submit an affidavit? No, there was a proclamation based on the condition of the victim. The condition of the victim. So did the fractured spine at the time, was it known, wasn't it, that there was no fractured spine? Absolutely not. At the time that the representations were made by the prosecutor, there was information that had been given by the medical personnel to the detectives, and there were no representations of these injuries. At that time, these were initial medical impressions that had been made. Wait, wait. Initial medical impressions? Yes. She was injured on the 18th of July. On the 20th of July, you go before the court and you ask for this emergency evidence deposition. Therefore, you know when you prepare a motion and notice, you do the appropriate things, and you know there's going to be a hearing on the following day. So you're telling me instead of getting new information, you're going to rely on what happened in a report from a different hospital several days prior, and not the most current information regarding her condition? Well, Your Honor, the information was coming in as it was represented by the state. In fact, the information that had changed from the initial representations regarding the initial impressions of the injury was that subsequently there was an X-ray taken and that there was a collapsed lung, and that representation was made on the 21st. But she had a lung problem. Anyway, let's talk about a fractured spine. You've looked at the deposition, haven't you? I mean, if somebody with a fractured spine, she didn't have a fractured spine, in fact. At that time, based on the conditions, the initial impressions, Isn't it misrepresentation to the court when you don't give current information? You're saying you have to go back to the 18th. When you go before the court on the 21st, you mean you don't have to update that? Your Honor, they were making a proffer on the 20th regarding the injuries. 21st, wasn't it? It was on the 20th that ASA Stephen Rosenblum in the bond hearing initially indicated that there was no fractured spine. Well, the hearing, the actual hearing did take place on the 21st. All right, so on the 21st, we know, and you've conceded, haven't you, that there was no fractured spine? Well, Your Honor, again, I mean the issue before this was Did you or did you not? Is that true or not? We ultimately found out Ultimately, wasn't it known to the doctors at that point? Because the only operation she was going to have, like you told the court, was she was going to have a pelvis surgery on Monday, right? You didn't mention that she was having spine surgery. But again, what we knew at that time was based on the medical information that had been gleaned from the detectives. Who talked to, the ASA spoke with the medical people? No, the ASA, as it was borne out by the record, had gleaned their information from talking to the detectives who were at the scene investigating not only the crime scene but also interviewing the witnesses as well as at the hospital and was relaying the information as it was being gathered at the hospital to the state's attorney who was in the courtroom and making the motion for the deposition. Where does the ASA say that this information is coming from the detectives? Right in front of Judge Hanlon and I would direct this court's attention to 252, Common Law 252. And that's where Judge Hanlon, there was a representation or a statement made that our review of the medical records and speaking to the physicians and Judge Hanlon asked... The state's attorney didn't review the medical records. No, and Judge Hanlon at the next question... Right, but I mean if the state's attorney says, our review of the medical records, I as a judge would think that the person saying that reviewed the medical records. Well, and Judge Hanlon asked the question right after that statement, so you have the medical records, you reviewed them, and the state clarified their position and said, no, your honors, we do not have the medical records at this time, that this is information that has been gleaned from the hospitals. Okay. And then... What tete-a-tete between the judge and the prosecutor indicated to the judge that this woman was unlikely or there was a strong probability or a good chance that she wouldn't make it through surgery in two days. How did that develop? Judge Hanlon specifically asked what the basis for the state's motion was and what they were basing their claim, that there was a substantial possibility of unavailability. And at that point, the state's attorney responded, our motion is based on age, the injuries sustained, the terminal cancer, and the impending surgery. Okay. Now, what evidence did the state's attorney who made that representation to Judge Hanlon have that this woman had terminal cancer? That's a serious statement. It was a statement that was made based on the information that had been gathered from the victim's family as well as the personnel at the hospital. But more importantly, those facts were not contested. I think you'll agree of telling a judge the truth and being candid and honest. Correct? You would agree. Absolutely. Okay. Now, common sense would, I think, indicate to everybody in this courtroom and to any living being that a 77-year-old about to undergo pelvic surgery is not likely to die in that surgery. It can happen, obviously, but pelvic surgery is not life-threatening, generally. Well, again, a major factor in that was the fact that her immune system had already been compromised by fighting the cancer that she did have. The representations that were made were accurate. Now, are you saying that is common knowledge or are you saying that this was evidence presented to the judge? Was there expert support for that conclusion? Was it even discussed that her immune system was such that she was so frail that this pelvic surgery was likely or created a probability of making her unavailable at the ultimate trial? It was discussed insofar as the total condition, totality of the circumstances of the condition of the victim. So was the state's attorney acting as her own expert with respect to this woman's medical condition? No, she was not. She was providing representations concerning her condition and coming to conclusions about what is ultimately going to happen to her. Your Honor, the conclusions that she was reaching insofar as the representations and as to the substantial possibility of unavailability was common sense. I mean, you had a 77- Well, that means she's acting as her own expert. She had a lot on the doctor. She said, I've come to the conclusion. No, she was asking the court that it's their belief that there was a substantial possibility based on these factors, the age, the terminal- Well, she's asking the judge to make a determination? Yes. The judge has to decide based on the facts that are presented to him whether to grant the taking of the deposition. And that is what Judge Hanlon did, and then Judge Lacey reviewed the representations as well as what was available. And as Judge Lacey specifically found, let's look at what was not disputed in any manner, shape, or form here. Let me ask you this question. In our court system, isn't the attorney supposed to present evidence to the judge so that the judge can make a decision? Well, there's- Just tell me, answer that question. I don't want to do like the judge at the proceeding and ask you to answer yes or no, but just tell me. Is the lawyer supposed to present evidence so the judge can make a decision? The judge is allowed to rely on a proffer made by an officer of the court. You don't think it would be helpful for the assistant state's attorney to have some affidavit from a doctor saying, this is why I've come to this conclusion, rather than using her own expertise in these matters to come to a conclusion? I mean, it might be helpful, but it's not required under Rule 414. Rule 414 says there must be a substantial possibility. Should a judge come to a conclusion that there's a substantial possibility based on representations made by an assistant state's attorney who's not a doctor? They can rely on the representations made by, yes, a state's attorney. I didn't say he could rely, but did she really have sufficient information to make those recommendations to the court? Yes, she did. She did. So she told the court that Gloria was declining every day, correct? Yes, Your Honor. She told the court that. Is there anything in her medical records that substantiates that? Where did she get that? Well, according to the- You're saying that's the true statement? Well, looking at the medical records as well as the medical testimony that was ultimately developed at the trial, Dr. Jim Hill- When at the trial. So she didn't have anything. She pulled that out of thin air, didn't she? No, Your Honor. Where are the doctors in the records? There's nothing to substantiate. In fact, you saw her in her testimony. She was pretty alert, wasn't she? She didn't seem to be in much pain. Well, those are not requirements for a substantial possibility. She said every day she's getting alerts. This is a couple things before her surgery. Well, Your Honor, the possibility of unavailability was the rationale behind that was the impending surgery. She wasn't in a store at the time of the deposition, but she was going into surgery. Again, to healthy people, it's a risky proposition. And to this woman, who happened to be a 77-year-old woman who had just been thrown down 14 flights of stairs, who, as Dr. Jim has testified, her CPK level- We're not talking about the testimony trial. We are talking about her making statements, representations to a court. And the representations were accurate based on the information that was available to the state at that time. That's your position, even though other things may have been said to Judge Lacey. But your position is everything was accurate at the time. Yes, that there was no intentional- She was unstable. Based on the circumstances of- It was a reasonable inference based on the fact that she was in the ICU unit. She wasn't in the ICU unit when she was deposed. And that's the same day that the ASA is standing before the judge. So how can you say that she's unstable? In fact, if she's unstable, should her deposition be taken? So where did this unstableness come from? That's not a misrepresentation of the court. Make inferences and not tell the judge I'm making an inference? Isn't that an important part to find substantial possibility, whether she's stable or unstable? Well, she was unstable because the surgery was scheduled for as soon as she stabilized, which was on Monday. Wait a minute. What does it say there in the record that they were waiting for her to be stabilized, that she was unstable? I mean, there's a medical term, too. This is on Friday. Usually, if the hospital was in a big emergency, they would have had the surgery right away, right? And usually, hospitals don't do surgery like that over the weekend. They don't work on weekends like that. So they could have scheduled it for the weekend if it was that unstable. But again, the issue before this court was inaccuracies made by the prosecutor, and the people's position is no, based on the information that they had, and which was proven by the evidence that came out at trial based on the medical testimony that was developed. It was developed when? We have to look at the hearing. At the hearing, we have an ASA making representations to a court. Shouldn't there be a hearing to determine whether those representations were accurate at the time? Was that ever done? Well, Judge Lacy heard all the arguments, saw all the supporting documentation over a prolonged period during the time when the parties below argued regarding the possibility of misrepresentation. And Judge Lacy, after reviewing all the evidence, after hearing all the arguments, properly found that there was no intentional misconduct. Yes, inadvertently, some misinformation had been given based on, of course, the fact that the representations made at the time before Judge Hamlin was based on what the people had in their possession at that time. And that Judge Lacy found, regardless, let's look at what was not contested and what was, there was no misrepresentations. The fact that she was 77 years old, nobody was contesting that. The fact that she did have a complex broken pelvis, nobody was contesting that. Did the ASA, or anyone with the state's attorney's office, speak with one of Gloria's treating physicians at the time so that they could give accurate information to the court on July 21st? No, based on the representations made below. And so to allow you to cover some other matters that you may want to, let's perhaps move on. Okay. Well, I mean, for the reasons stated in our brief, and maybe not as artfully before this court today, we would ask that the allowing of the deposition be affirmed. With respect to the admission of the deposition as evidence, there was no abuse of discretion. The criteria for admission was absolutely met in this case. The victim was unavailable at trial, and there was an adequate opportunity to cross-examine. Now, why do you say there was an adequate opportunity? Because of the length of time of the participation in the deposition, or what? The fact that when one looks at the contents of the actual cross-examination, as Judge Lacy noted, important areas, based on the information that was available to counsel, was explored, the defendant's lack of motive, the fact that the defendant was not a violent man. He was able to set her up for impeachment with prior statements made by others about falling. I mean, a slew, a litany of content areas were explored. And, in fact, this area that was explored was more than sufficient, based on the documents that were given. And, as I mentioned, a question was posed to defense counsel as to what documents were actually given at that time. And it wasn't just police reports. I mean, and as Justice Hyman pointed out, there were some photographs, too. And if I may, I mean all of the police reports, the arrest reports, there were detective supplements, there was forensic reports that had been given, there was Arlington Heights general case reports, there was evidence reports that were given, there were domestic violence supplemental reports given, there was the medical release, the preliminary hearing transcript, and, I mean, and it's all listed in the record. So all that stuff, and the lawyer has less than two hours to review it. Because... That's a pretty... And a man's liberty is at stake. In less than two hours, he's supposed to be able to review, and this is he in this case, review all that and be prepared and have analyzed it and talked to his client and done an investigation, all in two hours. I bet it took him more than two hours to prepare for this hearing. Well, then let's look at exactly what was said below regarding this lack of timing or lack of notice or whatever. I mean, defendant made a demand for trial even prior to this deposition. So by this demand, he was saying, I was ready to take on the onslaught of the entire state's case, and yet now he's complaining that he wasn't ready for this deposition. This reminds me of many years ago, after the Brady decision came down about tendering evidence favorable to the defense, and in the federal court, you won't believe this, but up until a few years ago, defense lawyers never received any discovery until after a witness testified on direct examination. The prosecutor would hand the defense lawyer the file, and the judge would say, proceed. For years, that was deemed, and it may be today, may be deemed compliant with discovery rules, but more intelligent thought has developed over the years to indicate that that just isn't good enough. You cannot hand somebody a box of information and tell them to proceed and expect them to proceed knowledgeably, intelligently, and thoroughly. So are you saying that the mere fact that he had all this information and the mere fact that he examined this woman for a period of time indicates that no harm, no foul? Is that your position? No, Your Honor. My position is that you do look at what occurred below regarding the cross-examination and the contents and what was available to defense counsel, and by the same token, what was available to the people at that time, and I would direct this Court's attention to the Smith case, which said in that particular case, the defendant was told that 435 evidentiary deposition is going to take place. He had 10 minutes to prep the victim, and the deposition was done 30 minutes later. And on appeal, he argued the lack of discovery, the lack of notice, we didn't have enough, this was unfair, and the Court found in reviewing the situation that the situation required that the deposition take place and that the defendant and the State were in the same position at the time with respect to the notice and the documents and that there was no undue prejudice to the defendant. And that case is cited in the People's Brief. But what I would also note here is that before Gloria passed away, there was a time period of 12 weeks, where if defense counsel felt that he was unable at that time to finish up his cross-examination or needed to ask further questions, he had that opportunity. But he didn't make himself available to that opportunity. Moreover, did he know she was going to die shortly thereafter? I mean, that sort of presupposes that he knew she was dying. And I don't see anything in this record that indicates that anybody thought she was going to die. She died. That stuff happens. If that's the case, then in every criminal case, the State should be allowed to take evidence depositions and force somebody into two hours' notice for cross-examination and that if that witness dies, they have the testimony, and if the witness doesn't die, they've got a prior statement that they have to turn over for discovery purposes. I mean, that's sort of a weak argument, I think. No, Your Honor, because, I mean, there was ongoing discovery as the trial was getting set to proceed, and understandably this extended through a long period of time before the trial actually occurred. But I mean, again, for a defendant to stand here and say, well, I could have asked her more questions. Well, you had 12 weeks where if you had that information, you could have asked her more questions while she was still available to be asked further questions, but he didn't do that. I mean, moreover, he was not prevented in any manner from presenting evidence at trial regarding his defense theories that he now claims that he could have asked further questions on to Gloria. Well, he said, she said. I mean, she's the main witness. Nobody else was there. It's her word against his word. That's the whole case. It's her word as to what occurred, which is corroborated by the forensic evidence, which is corroborated by the crime scene, which is corroborated by statements that defendant made himself, and it's also corroborated by the defense theory, which was alibi, which was uncorroborated and in fact destroyed by Peter Bannis in this case. And so it wasn't just a he said, she said. It was she said it. It was corroborated. He said it. What was he saying? But the case would have been substantially different without her testimony. I'm sorry? This prosecution's case would have been substantially different had they not had her testimony. Correct? It would have obviously changed the tenor of the prosecution, but she had made many statements to first responders that would have come in under exceptions to hearsay if the deposition hadn't occurred. And so the evidence that the prosecution would have presented concerning the fact that the victim had positively identified her son as the person who threw her over the railing, that evidence would still have been presented at the prosecution level. Okay. And so, I mean, Counsel, just let me ask you this question. So essentially you're arguing that the defendant had all the process he was due in terms of preparing for this evidence deposition. That's what you're saying, correct? He got some discovery. He got lots of discovery. Provided with an opportunity to ask some questions, that's legally sufficient for due process purposes. That's what you're asking the court to conclude, correct? Yes, that there was an adequate opportunity to cross-examine, and you look at all the factors such as your Honor just mentioned, the documents given, what was asked, you know, was it unrestricted? He was given unrestricted access to the cross-examination. And all of that, you're saying he had, during that 12-week period, an opportunity to come in and say, I want to ask some additional questions. Yes. And you also have to weigh it against, you know, the fact that he was not prevented from it for the evidence that he claims he would have developed during the cross-examination. It was presented via a different conduit at the trial level. And so for those reasons, really quickly, I would ask that the trial court's decision to admit the deposition be confirmed by this court. If the court would like, I would like to just briefly address just the other issues. I know that there was an issue made regarding the cross-examination of the defendant, and I would direct this court's. Briefly. Yes. We believe that it falls right within the auspices of People v. Turner. The Supreme Court has said that a defendant's credibility can be challenged by conflicting evidence, and that is exactly what was done in this case. We believe that, you know, that the fact that there was a repeating of the question was based on defendant's decision not to answer a properly framed question. There was no badgering in this case, and the trial judge, who was in the superior position to see the tenor of this cross-examination properly exercise its discretion in not curtailing and overruling the objections that were made. So for those reasons, and the one stated in our brief for that argument, we would ask that the cross-examination be affirmed with respect to in the favor of the people, that no error occurred. And lastly, with respect to the rebuttal closing argument, it was forfeited. No, it was not raised in the motion for new trial, and in fact, nine of the ten complaints were not even objected to at trial. In context, they were directly responsive to the defense argument, challenging the credibility, and there was nothing improper in doing that. Moreover, should this court find that any of the evidentiary, the cross-examination, or the closing argument was improper in any manner, this was a bench trial. It had no bearing on the ultimate decision made by the trial court in this case, based on the overwhelming evidence that was against the defendant, as outlined in our brief. And so for those reasons, again, the one stated here, as well as the one stated in our brief, we would ask that defendant's conviction be affirmed on appeal. Thank you. Thank you very much. Mr. Stone. I want to be brief and focused. At page 252 of the transcript, the prosecutor said, quote, from our review of the medical records and speaking to the physicians who have recovered from any surgery she undergoes, period. That's a false statement. On the same page, the prosecutor says, this is information that has been gleaned from the treating physicians at both Northwest Community Hospital, as well as Lutheran General Hospital. That's a false statement. At page 256 to 259, the prosecutor says, quote, we did speak to the hospital personnel. That's a false statement. Every day she is declining. That's a false statement. She has a collapsed lung. That's a false statement. She has multiple fractures to her pelvis. She has multiple abdominal injuries. That is a false statement. She has at this point unknown extensive cranial injuries and internal head injuries. That is a false statement. These were statements made to a judge by a public prosecutor. You cannot countenance that behavior. Please reverse and remand. Thank you. On behalf of the court, we would like to thank the counsel for excellent briefs, excellent argument. We will take this matter under advisement. The court will be in recess.